**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|                                         |     |                          |
|-----------------------------------------|-----|--------------------------|
| LARS CAVI,                              | :   |                          |
|                                         | :   |                          |
|                Plaintiff,               | :   |                          |
|       v.                                | :   |                          |
|                                         | :   |                          |
| EVOLVING SYSTEMS, INC.;                 | :   | C.A. NO. 15-1211-RGA/MPT |
| EVOLVING SYSTEMS NC, INC.               | :   |                          |
| d/b/a/ SIXTH SENSE MEDIA;               | :   |                          |
| RATEINTEGRATION, INC. d/b/a             | :   |                          |
| SIXTH SENSE MEDIA, AND                  | :   |                          |
| THOMAS THEKKETHALA                      | :   |                          |
|                                         | :   |                          |
|                Defendants.              | :   |                          |

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Defendants, Evolving Systems, Inc., Evolving Systems NC, Inc., d/b/a Sixth

Sense Media, Rateintegration, Inc., and Thomas Thekkethala move to dismiss this

action by Plaintiff, Lars Cavi, alleging breach of fiduciary duties, fraudulent inducement,

equitable fraud, negligent misrepresentation, breach of contract, breach of good faith

and fair dealing, promissory estoppel, unjust enrichment, securities law violations, and

quantum meruit.  For the reasons that follow, the court will grant and deny Defendants'

motion in part.

### II.  BACKGROUND

In early 2009, defendant Thomas Thekkethala ("Thekkethala") began recruiting

plaintiff Lars Cavi ("Cavi") to work for Rate Integration Incorporated ("RII") as the part-

1

time Vice President of Europe, Middle East, and Africa Sales ("EMEA").[1]  During the

course of the negotiations, Thekkethala told Cavi that a significant part of his

compensation package would be an equity interest in RII via annual stock options.[2]

Thekkethala represented to Cavi that RII was worth around $20 million based on its

valuation of $4 per share with 5 million shares outstanding.[3]  Cavi's initial equity stake

was at $50,000 per year as determined by this valuation of RII.[4]  Thekkethala explained

the compensation model in detail advising that Cavi was to receive a 1% ownership

interest, which would vest over 4 years, and that he would receive future opportunities

to purchase shares in RII.[5]

On January 10, 2009, Thekkethala further responded to Cavi's inquiry relating to

the nature of the equity offer stating that "[a]lthough external market/outside investors

value the company at $20 million or $4 per share, you [Cavi] would be issues [sic]

options at close to 5 cents.  Assuming the company is acquired at $20 per share, you

will make $19.95 per share in profit from exercising the shares."[6]  Cavi signed an offer

letter dated January 21, 2009 to work for RII with a commencement date of February 2,

2009.[7]  Cavi's negotiated compensation was a base salary, a yearly Management By

Objectives ("MBO") bonus, commission on net revenue (with no restrictions regarding

products sold), and the stock options in RII.[8]

---

[1] D.I. 31 Ex. 1 at ¶24-25.
[2] *Id.* at ¶29.
[3] *Id.* at ¶32, 36.
[4] *Id.* at ¶36.
[5] *Id.* at ¶37, 38.
[6] *Id.* at ¶47.
[7] *Id.* at ¶51.
[8] *Id.*

Late 2009 Thekkethala approached Cavi to join RII full-time as Vice President of EMEA Sales, which required Cavi to terminate his other part-time job with Zeugma Systems.[9]  In an email dated November 10, 2009, Cavi stated that he would require an increase in his base pay, larger commissions, "12500 [stock] options to be granted at fair market value per year (i.e. first grant being Feb 1, 2010) and confirmation that 12500 shares currently represent 0.25% of the total outstanding shares and confirmation of the current market value of RII . . . ."[10]  On January 24, 2010, Cavi signed an offer letter accepting the position of full-time Vice President of EMEA Sales starting February 1, 2010.[11]  The compensation for the promotion entailed an increase in his yearly base salary, an increase in yearly MBO compensation, an identical commission schedule, and additional options to purchase 75,000 shares of stock.[12]

On October 1, 2010, Cavi was promoted to Vice President of Worldwide Sales.[13] The promotion included a base salary, MBO payments, commissions for new sales revenues, and additional options to purchase 37,500 shares of common stock at $0.01 a share.[14]  Included in the offer letter  was the statement "[i]n the event of an expansion of the Option Pool you [Cavi] will be granted additional shares to retain your approximate 2.25% equity participation.  Further in the event of an acquisition of the company for cash or an IPO your options will accelerate and vest in full."[15]  The Offer

---

[9] *Id.* ¶67.
[10] *Id.* at ¶69.
[11] *Id.* at ¶73.
[12] *Id.* at ¶74.
[13] *Id.* at ¶78.
[14] *Id.* at ¶81, 86.
[15] *Id.* at ¶88.

3

Letter also noted that Cavi already "submitted a request to 'advance purchase' all [his] eligible unvested shares (112,250 less shares already vested as of September 30th, 2010) . . . ."[16]

In late 2014, Thekkethala advised Cavi that RII was seeking a purchaser and received offers for $10 million dollars.[17]  During a Skype conversation on November 19, 2014, Thekkethala provided Cavi with a PowerPoint presentation in an effort to convince Cavi to align with him in a shareholders' dispute over the sale.[18]  During his review of the PowerPoint presentation, Cavi learned that the actual value of RII was between $5.8 and $11.5 million.[19]  Cavi also discovered that there were outstanding shares of preferred stock totaling $25 million, which would receive a payout before his common stock in the event of an acquisition, and a Management Carve-Out.[20]

After learning about the preferred shares and the Management Carve-Out, which rendered all shares of common stock worthless in this acquisition, Cavi wrote Thekkethala on December 3, 2014 demanding Thekkethala immediately provide preferred shares equal to the amount of common stock Cavi had accumulated.[21] Thekkethala assured Cavi, in subsequent phone conversations and in-person, that Cavi was owed compensation for his equity stake in RII, if the company were acquired, and represented that RII would allow Cavi to participate in the Management Carve-Out.[22]

---

[16] *Id.* at ¶89.
[17] *Id.* at ¶96.
[18] *Id.* at ¶99.
[19] *Id.* at ¶103.
[20] *Id.* at ¶106, 107.
[21] *Id.* at ¶115, 116.
[22] *Id.* at ¶118.

On January 30 2015, Cavi received an email from Thekkethala that outlined a new Sales Commission Policy, which had significantly lower rates compared to the previous years.[23] In March 2015, RII paid Cavi's February commissions based on the new lower rate for all purchase orders including those already received prior to January 30, 2015.[24] After Cavi complained to RII's finance department, he was paid the remainder of the commissions owed.[25] In early April 2015, RII again paid commissions based on the new lower rate for all purchase orders including those that predated the new commission plan.[26] Cavi complained to the finance department again, but this time RII did not pay the total commissions.[27] Due to the Thekkethala's refusal to provide Cavi with the appropriate equity interest in RII, coupled with the refusal to pay the commissions owed, Cavi terminated his employment with RII on June 30, 2015.[28]

On September 30 2015, Evolving Systems NC, Inc. and its wholly owned subsidiary Evolving Systems, Inc. were merged with and into RII.[29] The total distribution to the stockholders was $9,745,220.33, and the Management Carve-Out plan payment was $1,817,790.[30] Cavi received the Notice to Merger on October 1, 2015.[31] This was the first time that Cavi learned that Thekkethala had not kept his promise of including Cavi within the Management Carve-Out.[32]

[23] Id. at ¶138, 139.
[24] Id. at ¶142.
[25] Id. at ¶143, 144.
[26] Id. at ¶145.
[27] Id. at ¶146.
[28] Id. at ¶147.
[29] Id. at ¶150.
[30] Id. at ¶155,156.
[31] Id. at ¶158.
[32] Id.

## III.  STANDARD OF REVIEW

**Motion to Dismiss**

In analyzing a motion to dismiss under FED. R. CIV. P. 12(b)(6), a review of Rule

8(a)(2) is necessary.  It requires that a pleading contain a "short and plain statement of

the claim showing that the pleader is entitled to relief."  That standard "does not require

'detailed factual allegations,' but . . . demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation."[33]  Thus, to survive a motion to dismiss under Rule

12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a

claim for relief that is plausible on its face.'"[34]  The purpose of a Rule 12(b)(6) motion to

dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide

the merits of the case.[35]  Evaluating a motion to dismiss under Rule 12(b)(6) requires

the court to accept as true all material allegations of the complaint.[36]  "The issue is not

whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer

evidence to support the claims."[37]  A motion to dismiss may be granted only if, after,

"accepting all well-pleaded allegations in the complaint as true, and viewing them in the

light most favorable to the plaintiff, plaintiff is not entitled to relief."[38]

To survive a motion to dismiss under Rule 12(b)(6), however, the factual

---

[33] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007).

[34] *Id.,* citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 12(b)(6).

[35] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

[36] *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).

[37] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citation omitted).

[38] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).

allegations must be sufficient to "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[39] A plaintiff is obliged "to provide the 'grounds' of his 'entitle[ment] to relief'" beyond "labels and conclusions."[40]  Heightened fact pleading is not required:  rather "enough facts to state a claim to relief that is plausible on its face" must be alleged.[41]  The plausibility standard does not rise to a "probability requirement," but  requires "more than a sheer possibility that a defendant has acted unlawfully."[42]  Rejected are unsupported allegations, "bald assertions," or "legal conclusions."[43]  Further, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."[44]  Moreover, "only a complaint that states a plausible claim for relief survives a motion to dismiss," which is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[45] Well-pled facts which only infer the "mere possibility of misconduct," do not show that "'the pleader is entitled to relief,'" under Rule 8(a)(2).[46]  "When there are well-pleaded

---

[39] *Twombly*, 550 U.S. at 555; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).

[40] *Twombly*, 550 U.S. at 555.

[41] *Id.* at 570.

[42] *Iqbal*, 129 S. Ct. at 1949.

[43] *Id.* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light* Co., 113 F.3d 405, 417 (3d Cir. 1997) ("unsupported conclusions and unwarranted inferences" are insufficient); *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996) (allegations that are "self-evidently false" are not accepted).

[44] *Iqbal*, 129 S. Ct. at 1949; *see also Twombly*, 550 U.S. at 555 (a court is "not bound to accept as true a legal conclusion couched as a factual allegation").

[45] *Id.* at 1950.

[46] *Id.*

factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief."[47]

"Courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" when reviewing a motion to dismiss.[48]  Rule 12(d) addresses the use of materials which are outside the pleadings in motions to dismiss under Rule 12(b)(6).  When such materials are presented, the motion is treated as one for summary judgment.  However, certain additional materials may be consider without converting the motion to dismiss into a motion for summary judgment.  A court is not limited to the four corners of the complaint and may consider "matters incorporated by reference integral to the claim, items subject to judicial notice, matters of public record, orders [and] items appearing in the record of the case."[49]  A plaintiff is entitled to notice and a fair opportunity to respond to any evidence the court might consider in its review of a motion to dismiss.  Where a plaintiff had such notice, however, it is proper for the court to consider that evidence.[50]

---

[47] *Id.*

[48] *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 988 F.2d 1192, 1196 (3d Cir. 1993).

[49] *Buck v. Hampton Tp. School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2004)).**[**This would include taking judicial notice of the public records of a State court action and an appeal therefrom.  *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12 (b)(6) motion, a court may properly look at public records, *including judicial proceedings*, in addition to the allegations in the complaint."  (emphasis added).**]**  Further,"exhibits attached to the complaint whose authenticity is unquestioned" may also be considered.  5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2007).

[50] *Pension Benefit*, 998 F.2d at 1196-97 ("When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.") (internal citations omitted).

## IV.  DISCUSSION

### A.  Statute of Limitations (Counts I-IV and VI-XIII)

Defendants argue that all but Count XIII are time barred under 10 Del. C. § 8111 which states:

> No action for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with any such action, shall be brought after the expiration of 1 year from the accruing of the cause of action on which such action is based.

Plaintiff responds that 10 Del. C. § 8106 governs this dispute, which allows a three-year statute of limitations for actions that include breach of contract, fraud, misrepresentation, unjust reliance, breach of good faith and fair dealing, promissory estoppel, and quantum meruit.

While this court has found that Section 8111 has a "comprehensive sweep . . . [since] the word 'benefits' is embracing and covers all advantages growing out of the employment,"[51] the Delaware Supreme Court has held that "if there is doubt as to which of two statutes of limitations applies, that doubt should be resolved in favor of the longer period."[52]

While Plaintiff's claims arise out of an employee-employer relationship, they are based on the intentional or negligent misrepresentation of the value of the stock option and unjust enrichment to Defendants.  Any potential ambiguity regarding as to which

---

[51] *Sorensen v. Overland Corp.*, 142 F. Supp. 354, 360 (D. Del. 1956), *aff'd sub nom Sorensen v. Overland Corp.*, 242 F.2d 70 (3d Cir. 1957).
[52] *Sonne v. Sacks*, 314 A.2d 194, 196 (Del. 1973).

statute operates, the longer limitation period is applied, which is Del. C. § 8106.  The

fraud was learned by Plaintiff on November 19, 2014, and suit was filed December 28,

2015, well within the three year statute of limitations for this claim.

**B.  Plaintiff's Claims Against Defendant Evolving Systems, Inc. (Counts II-VII and X-XIII)**

ESI argues that Plaintiff can not allege that it:  i) ever entered into a contract with

Plaintiff; ii) made any representation or promise to Plaintiff; iii) issued or breached any

fiduciary duty to him; iv) received any services performed by Plaintiff; or v) issued any

securities to him.[53]  "Under ordinary circumstances, a parent corporation will not be

liable for the obligations of its subsidiary.  Limited liability is the general rule, not the

exception."[54]

Plaintiff argues that the claim against ESI is based on successor liability.  The

four exceptions to the rule of successor nonliability are:  "(1) where the purchaser of

assets expressly or impliedly assumes the liabilities of the transferor; (2) where the

transaction amounts to a *de facto* merger; (3) where the purchasing corporation is

merely a continuation of the transferor corporation; and (4) where the transaction is

fraudulently intended to escape liability."[55]  Plaintiff alleges that the Notice of Merger

establishes that together both ESI and ESNC acquired RII; that the acquisition was a *de

facto* merger between RII and ESNC; that ESI and ESNC assumed liabilities; that the

purchasers are merely a continuation of RII; and that Thekkethala would be CEO of the

---

[53] D.I. 29 at 7.
[54] *Mobile Oil Corp. v Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989).
[55] *Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 565 (3d Cir. 1997).

continued entity.[56]

Plaintiff has not alleged facts that may entitle him to possible relief on this count against ESI.  ESI is the parent corporation of ESNC, which was merged into RII, who is doing business as the new company, Sixth Sense Media.[57]  For a parent company to be liable for its subsidiary, "the issue of liability rests on the amount of control the parent corporation exercises over the actions of the subsidiary."[58]  To hold a parent company liable for the actions of the subsidiary, "[t]he control must be actual, participatory and total."[59]  Factors considered in determining "domination" include "stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses and origin of subsidiary's business and assets."[60] In the complaint, the only contention is that Thekkethala, the CEO, President, and member of the Board of Directors of RII would remain as the CEO and President of the merged company.[61]  Plaintiff does not sufficiently allege that ESI dominated ESNC as required and all claims against ESI should be dismissed.

### C.  Breach of Duty of Care

Defendants contend that Plaintiff fails to state a claim for breach of the fiduciary duty of care because they did not owe a duty of care to Plaintiff before February 2010, when Plaintiff exercised his option to become a stockholder; they did not breach the

---

[56] D.I. 24 at ¶150-160; D.I. 24-5 at § 1.4.
[57] D.I. 24-5 at p. 1.
[58] *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, No. Civ. A. 83C NO 98, 1988 WL 32012, at *4 (Del. Super. Ct. Mar. 30, 1988).
[59] *Id.*
[60] *Id.*
[61] D.I. 24 at ¶22-23.

duty of care; and RII's Certificate of Incorporation has an exculpation provision eliminating liability for a breach of the duty of care.

In order to assert a claim of breach of fiduciary duty, a plaintiff must show that a fiduciary duty exists and the defendant breached that duty.[62]  Upon showing of a fiduciary relationship, Delaware law recognizes a "triad of fiduciary duties to uphold:  the duty of care, loyalty and good faith."[63]

### i.  The Duty of Care

"In order to show that the . . . directors breached their duty of care . . .  plaintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of . . . . "[64]  The duty of care allows honest mistakes of judgement provided the director acted with good faith and after a reasonable investigation.[65]  Conduct on the level of gross negligence is actionable.[66]

Plaintiff alleges that Defendants breach their fiduciary duty of care towards him beginning February 1, 2010 when the duty first applied.  Before that date, Plaintiff was a stock option purchase holder, who was not owed any fiduciary duty until the option was exercised since the option holder's rights are entirely contractual.[67]  Plaintiff alleges

---

[62] *In re Tropicana Ent., LLC*, 530 B.R. 455, 470 (D. Del. 2014).
[63] *In re Midway Games v. Nat'l Amusements Inc.*, 428 B.R. 303, 313 (D. Del. 2010).
[64] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).
[65] *Cheff v. Mathes*, 199 A.2d 548, 555 (Del. 1964).
[66] *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000).
[67] *Reis v. Hazelett Strip-Corp.*, 28 A.3d 442, 478 (Del. Ch. 2011).

Defendants violated this duty by deceiving him about the values of the company and the liquidation preferences during negotiations in September 2010,[68] and did so repeatedly until Plaintiff learned about the misrepresentations on December 3, 2014.[69]

Plaintiff sufficiently plead that Defendants deceived him about the values of the company and the liquidation preferences from February 1, 2010 until his discovery of the misrepresentations on December 3, 2014.[70]  Plaintiff sufficiently pled that Defendants knowingly or negligently omitted material information;[71] Defendants knew the correct valuation of RII at the time the misrepresentation occurred;[72] and Defendants knowingly disseminated false information and/or omitted information which resulted in injury to Plaintiff[73].

Defendants argue that RII's Certificate of Incorporation has an exculpation provision that eliminates liability for a breach of duty of care under 8 Del. C. § 102(b)(7). "Delaware state courts characterize a § 102(b)(7) charter provision as in the nature of an affirmative defense . . . such defenses will generally not form the basis of a Rule 12(b)(6) dismissal . . . ."[74]  As a result, the claim should not be dismissed under either argument.

### ii.  Fiduciary Duty of Loyalty

Defendants argue that this count should be dismissed because directors of a

---

[68] D.I. 24 ¶ 91.

[69] D.I. 24 ¶ 165.

[70] D.I. 24-1 ¶ 165.

[71] *Id.* at ¶ 167.

[72] *Id.* at ¶ 165.

[73] *Id.* at ¶ 177.

[74] *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inv. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008).

Delaware corporation are required to disclose fully and fairly all material information within the board's control only when shareholder action is sought.  In the absence of a shareholder action, Delaware law does not require directors to provide shareholders with information concerning the finance or affairs of the corporation.[75]  This argument by Defendants fails upon the case they cite.  *Malone* explicitly states that "[w]henever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty."[76]

Defendants' second argument is that the information provided was not false, but a projection based on anticipated growth of the company.  The Compensation Model attached to the complaint provides that "[a]ctual compensation will be based on your performance and the performance of the company."[77]  Plaintiff alleges in his complaint that the misrepresentations and omissions relating to the value of the of the shares of RII continued throughout the negotiations of the January 2010 Offer Letter, the September 2010 Offer Letter, and until his resignation.[78]  Plaintiff also alleges that Defendants, through Thekkethala, misrepresented the value of his stock options and his ownership interest, the value of RII's stock, the value of RII, and the payout structure in case of a sale of RII.[79]

Defendants' final argument is that, under the business judgement rule, this claim

---

[75] *Malone v. Brincat*, 772 A.2d 5 (Del. 1998).
[76] *Malone*, 772 A.2d at 5.
[77] D.I. 24-1.
[78] D.I. 24 ¶ 167.
[79] D.I. 21 ¶ 176.

should be dismissed.  The business judgement rule ". . . operates as both a procedural guide for litigants and a substantive rule of law.  As a rule of evidence, it creates a 'presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company.'"[80]  Defendants assert that Plaintiff has failed to overcome the business judgment rule in his claim for breach of fiduciary duty.

These arguments also fail.  "[A] plaintiff will not be thrown out of court on a Rule 12(b)(6) motion for lack of detailed facts.  To say that a plaintiff's claim appears factually weak is not to say that he states no claim."[81]  In this case, sufficient facts are asserted to support a basis for relief.  The complaint does not have to plead around the business judgment rule; but state a claim with sufficient information for which relief may be granted.[82]

Because of these reasons, Defendant's motion to dismiss the duty of loyalty claim should be denied.

### D.  Plaintiff's Claim for Fraud (Counts II-IV)

#### i.  Economic Loss Doctrine

Defendants argue that Plaintiff's claims for fraud are barred by the economic loss doctrine.  "The economic loss doctrine is a judicially created doctrine that allows a party

---

[80] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993), citing *Aronson v. Lewis, Del.Supr.*, 473 A.2d 805, 812 (1984).

[81] *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 556 (D. Del. 2008).

[82] *Id.*

to recover in tort only if losses are accompanied by bodily harm or property damage; in other words, the doctrine prevents plaintiffs from recovering in tort for losses suffered that are solely economic in nature."[83]  Fraud is a recognized exception to the economic loss doctrine.[84]  Allegations of fraud that go directly to the inducement of the contract, rather than its performance, present a viable claim.[85]  This court has recognized that a plaintiff may plead a negligent misrepresentation claim by showing the defendant supplied information for use in transactions with third parties and is in the business of supplying information.[86]

In this case, the fraud claimed by Plaintiff is in the inducement to work for Defendants.  During the negotiation periods in January 2009 and September 2010, Plaintiff contends that Defendants knew the amount of preferred shares outstanding and the management carve-out which made his stock worthless.[87]  Because Plaintiff is alleging the fraud was in the inducement of the contract and not obligations arising out of the contract, the economic loss doctrine should not bar these claims.

### ii.  The Integration Clause in Plaintiff's Contract

Defendants argue that Plaintiff's claims of fraud should be dismissed because each contract contains an identical integration clause which provides that all terms and

---

[83] *Kuhn Const. Co v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 526 (D. Del. 2012).

[84] *Council of Unit Owners of Sea Colony E., Phases III, IV, VI & VII Condo., On Behalf of Ass'n of Owners v. Carl M. Freeman Assocs., Inc.*, 1990 WL 177632, at 5 (Del. Supr. Oct. 16, 1990).

[85] *Brasby v. Morris*, 2007 WL 949485, at 7 (Del. Super. Ct. Mar. 29, 2007).

[86] *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.*, 2002 Del. Super. LEXIS 305 at 14 (Del. Super. Ct. June 13, 2002).

[87] D.I. 24 ¶ 268-269.

conditions of Plaintiff's employment are included.  Each integration clause provides:

> This letter and any other terms and conditions incorporated by reference herein, contain the entire understanding of you and the Company with respect to the subject matter hereof, and supersede any and all related prior understanding and agreements, oral or written. There are no oral or written promises you have received except as contained in this letter.[88]

To exclude parol evidence to show fraudulent inducement, a merger clause "must specifically disclaim previous representations."[89]  The presence of a standard integration clause alone, which does not contain an explicit anti-reliance representation and is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that he was not relying on facts outside the contract, will not suffice to bar claims for fraud.[90]

In this case, the disclaimer in Plaintiff's employment agreement does not preclude his reliance on Defendants' misrepresentations and omissions relating to the value of RII.

### iii.  Counts Required to be Pled with Particularity (Counts II-IV)

Defendants argue that Plaintiff did not state his claim of fraud with the required particularity to survive a motion to dismiss.  "[T]he requirement of particularity does not require an exhaustive cataloging of facts but only sufficient factual specificity to provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred."[91]  The elements of common law fraud require a showing that:

---

[88] D.I. 1 at Ex. 4 at 2.

[89] *Pivotal Payments Direct Corp. v Planet Payment, Inc.*, 2015 Del. Super. LEXIS 1058, at 15 (2015).

[90] *Addy v. Piedmonte*, 2009 Del. Ch. LEXIS 38, 64 (2009).

[91] *Household Int'l, Inc. v. Westchester Fire Ins. Co.*, 286 F. Supp. 2d 369, 373 (D. Del. 2003).

(1) a defendant made a false representation, usually on of fact; (2) the defendant had the knowledge or believed that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.[92]

Equitable fraud differs from common law fraud in that "a plaintiff is not required to show that the defendant committed fraud knowingly or recklessly."[93]   A claim for negligent misrepresentation does not require a knowing state of mind, and a plaintiff need only plead that defendant had a pecuniary duty to provide accurate information; defendant supplied false information; defendant failed to exercise reasonable care in obtaining or communicating the information; and he suffered a pecuniary loss caused by justifiable reliance.[94]   "To satisfy Rule 9(b), a complaint must allege:  i) the time, the place, and contents of the false representation; ii) the identity of the person making the representation; and iii) what the person intended to gain by making the representations."[95]

Here the complaint alleges the time, place, and content of the false representation in the recruitment of Plaintiff to work for RII.  Plaintiff identifies the person who made the false representations as Thekkethala.  Plaintiff finally states that the intent of the party who made the false representation was to convince Plaintiff to work for RII at a lower salary which would be supplemented by stock options.  Because the

---

[92] *Addy v. Piedmonte*, 2009 Del. Ch. LEXIS 38 at 61 (2009).
[93] *Delphi Petroleum v. Magellan Terminals Holdings, L.P.*, 2015 Del. Super. LEXIS 33 at 16 (2015).
[94] *Boulden v. Albiorix, Inc.*, 2013 Del. Ch. LEXIS 31, 54-55 (2013).
[95] *Narrowstep, Inc. v Onstream Media Corp.*, 2010 WL 5422405, at 12 (Del. Ch. Dec. 22, 2010) (citations omitted).

specifics of fraud has been adequately pled, the motion to dismiss counts II-IV should be denied.

### E.  Plaintiff's Claim for Breach of Contract (Count VI)

Defendant argues that Count VI of the complaint should be dismissed.  In this count, Plaintiff alleges that all three offer letters stated the amount of stock options that he would receive, as well as, the value of the corresponding shares.  Defendants contend that all promises made to Plaintiff were set out within the offer letters, which contained an integration clause that confined the contractual obligations to the four corners of the agreement and the documents specifically incorporated.  Plaintiff alleges the contract was breached due to Defendants' oral promise to include him in the management carve-out when RII was sold.

Under Delaware law, "to survive a motion to dismiss for failure to state a breach of contract claim, [a] plaintiff must demonstrate:  first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[96]

The first element is obviously met.  Plaintiff and Defendants had multiple employment contracts, which are attached to the complaint.[97]  The obligation imposed was for Defendants to pay wages, and among other things, to provide Plaintiff with the option to purchase common shares of stock in the company.  The breach, asserted by Plaintiff, is predicated on oral representations made prior to the execution of a contract.  Since the integration clause provides that each contract supercedes all oral or written

---

[96] *Weyerhaeuser Co. v. Domtar Corp.*, 61 F. Supp. 3d 445, 449 (D. Del. 2014).
[97] D.I. 1, Ex. 4, 7, 8.

promises made before entering into the contract, no breach occurred.

Plaintiff also contends that breach of the applicable contract occurred on March 3-4, 2015, when Defendants orally promised to include him in the management carve-out in exchange for his continued employment.  This promise also is barred by the integration clause which specifies:  "[t]his letter cannot be modified or amended except in writing and signed by the Company."  Including Plaintiff in the management carve-out would have been a modification of the employment agreement, which needed to be in writing and executed by the company for it to be enforceable.

Therefore, count VI should be dismissed.

**F.  Plaintiff's Claim for Breach of Good Faith and Fair Dealing (Counts VII-VIII)**

Defendants argue that Plaintiff fails to state a claim for a breach of the covenant of good faith and fair dealing.  The covenant of good faith and fair dealing is implied in every agreement in Delaware.[98]  Under Delaware law, "the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain.  Thus, parties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms.[99]

Here, Plaintiff alleges that Defendants' failure to provide stock options of the

---

[98] *HSMY, Inc. v. Getty Petroleum Mktg., Inc.*, 417 F. Supp. 2d 617, 621 (D. Del. 2006).
[99] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

value as promised deprived him of the benefit of the bargain implied in the employment contract.[100]  Plaintiff alleges that he received no benefit when he exercised his stock option due to the concealment of the 3.7 million shares of preferred stock and the management carve-out.  Plaintiff also alleges that Defendants violated the implied covenant of good faith and fair dealing when they unilaterally lowered the rate of commission, and applied it retroactively to sales generated before January 30, 2015. Both actions deprived Plaintiff of the "fruits of the bargain" and frustrated the overarching purpose of the deal.

Because Plaintiff sufficiently stated a claim of breach of good faith and fair dealing, Defendants' motion to dismiss on this issue should be denied.

### G.  Plaintiff's Claim for Quantum Meruit (Count IX)

Defendants argue that Plaintiff fails to state a claim for quantum meruit.  Under Delaware law, to support a claim of quantum meruit, Plaintiff must plead he "provided services with an expectation that the defendant would pay for them . . . [and] that the services were performed under circumstances which should have put the defendant on notice that the . . . party expected to be paid . . . ."[101]  Under this theory, Plaintiff "ask[s] the Court to imply a promise by defendants to pay for plaintiff's extra work.  Such an implied promise to pay for work performed gives rise to a quasi-contract upon which plaintiff may recover."[102]  "The existence of an express agreement, whether written or

---

[100] D.I. 24 at ¶331-334.
[101] *Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*, 540 F. Supp. 2d 528, 536 (D. Del. 2008).
[102] *J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F. Supp. 982, 988 (D. Del. 1988).

oral, precludes the finding of a quasi-contract."[103]

In this case, Plaintiff alleged that he had an express agreement with RII,[104] which "precludes the finding of a quasi-contract."[105]   "[W]here an enforceable contract exists between the parties, recovery on a theory of *quantum meruit* is inapplicable."[106]

Because Plaintiff pled that an express contract exists, this claim should be dismissed.

### H.  Plaintiff's Claim for Promissory Estoppel (Counts X-XI)

Defendant argues that Plaintiff fails to state a claim for promissory estoppel.  "In order to establish a claim for promissory estoppel, a plaintiff must show . . . that:  (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[107]   "[P]romissory estoppel has no application where an express agreement is enforceable between the parties."[108]

In this matter, an express agreement is alleged to exist between Plaintiff and Defendants.[109]  As a result, there is no foundation to maintain a claim for promissory estoppel.

Because Plaintiff contends an express contract exists, this claim should be

---

[103] *Id.*
[104] D.I. 1, Ex. 4, 7, 8.
[105] *J.A. Moore Const. Co.*, 688 F. Supp. at 988.
[106] *Patterson Woods & Assocs., LLC v. Realty Enterprises, LLC*, No. Civ. A. 05C-01-224JOH, 2008 WL 2231511, at 15 (Del. Super. Ct. May 21, 2008).
[107] *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000).
[108] *In re U.S. W., Inc. Sec. Litig.*, 201 F. Supp. 2d 302, 308 (D. Del. 2002).
[109] D.I. 1, Ex. 4, 7, 8.

dismissed.

### I.  Plaintiff's Claim for Unjust Enrichment

Defendant argues that Plaintiff's claim for unjust enrichment fails.  Unjust

enrichment is "the unjust retention of a benefit to the loss of another, or the retention of

money or property of another against the fundamental principles of justice or equity and

good conscience."[110]  The elements of unjust enrichment are:  (1) an enrichment, (2) an

impoverishment, (3) a relation between the enrichment and impoverishment, (4) the

absence of justification, and (5) the absence of a remedy provided by law.[111]  "A claim

for unjust enrichment is not available if there is a contract that governs the relationship

between parties that gives rise to the unjust enrichment claim."[112]

In this case, since an express agreement was made between Plaintiff and

Defendant,[113] the claim for unjust enrichment is a breach of contract claim.  This count

should be dismissed as evidenced by the employment agreements attached to the

complaint.

### J.  Plaintiff's Claims for Violation of Federal and North Carolina Securities Laws

Defendants argue that Plaintiff fails to state a violation under N.C. Gen. Stat.

§ 78A-1 et seq. and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

The Securities Exchange Act provides in rule 10b-5 that:

It shall be unlawful for any person, directly or indirectly, by the use of any
means or instrumentality of interstate commerce, or of the mails or of any

---

[110] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).
[111] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).
[112] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).
[113] D.I. 1, Ex. 4, 7, 8.

facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light
of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates
or would operate as a fraud or deceit upon any person, in connection with
the purchase or sale of any security.[114]

To prevail on a securities fraud claim under 15 U.S.C. § 78a rule 10-b, plaintiff must

show:  (1) a material misrepresentation or omission by defendants, (2) scienter, (3) a

connection between the misrepresentation and the purchase or sale of a security, (4)

reliance, (5) economic loss, and (6) loss causation.[115]  Section 78A-8 "closely parallels

the Rule 10b-5 antifraud provision of the Securities Exchange Act."[116]  Accordingly, the

court construes section 78A-8 in accordance with Rule 10b-5.[117]  Section 78A-8

provides:

It is unlawful for any person, in connection with the offer, sale or purchase
of any security, directly or indirectly:
(1) To employ any device, scheme, or artifice to defraud,
(2) To make any untrue statement of a material fact or to omit to state a
material fact necessary in order to make the statements made, in the light
of the circumstances under which they are made, not misleading or,
(3) To engage in any act, practice, or course of business which operates
or would operate as a fraud or deceit upon any person.

To state a claim for violation of N.C. Gen. Stat. § 78A-8, Plaintiff must plead that:

(1) a false or misleading statement, or a statement which, because of the circumstances

under which it was made, is false or misleading due to the omission of other facts, (2)

the statement was material, and (3) the statement was made by one who offered or sold

---

[114] 17 C.F.R. § 240.10b-5.
[115] *Matrixx Initiatives, Inc. v. Siracusane*, 563 U.S. 27, 36 (2011).
[116] *State v. Davidson*, 506 S.E.2d 743, 748 (N.C. App.1998).
[117] *Id.*

24

a security.[118]  Additionally, both claims must satisfy the heightened pleading

requirements of Fed. R. Civ. P. 9(b) for the federal violation and N.C. R. Civ. P. 9(b) for

the state violation.[119]  Finally, to support a violation of the Securities Exchange Act, in

addition to Rule 9(b), securities fraud allegations must also comply with the heightened

pleading requirements of the Reform Act, 15 U.S.C. §78u–4(b)(1), (b)(2).  Plaintiff must

"specify each statement alleged to have been misleading, the reason or reasons why

the statement is misleading, and, if an allegation regarding the statement or omission is

made on information and belief, the complaint shall state with particularity all facts on

which that belief is formed."[120]

Defendants first maintain that Plaintiff has not sufficiently plead the economic

loss element § 78A-8.  "In order to satisfy the loss causation requirement . . . the plaintiff

must show that the defendant misrepresented or omitted the very facts that were a

substantial factor in causing the plaintiff's economic loss."[121]  In the complaint, Plaintiff

alleges, with enough specificity, that the omission of the existence of preferred shares

and the management carve-out were the loss causation making his shares worthless

from the beginning.[122]  This contention shows a causal relationship between the

misrepresentation or omissions and Plaintiff's economic loss.

Defendants further argue that Plaintiff did not incur any economic loss because

---

[118] *Skoog v. Harbert Private Equity Fund, II, LLC*, 2013 WL 1223396 at 5 (N.C. Super. 2013).

[119] *Associated Packaging, Inc. v. Jackson Paper Mfg. Co.*, 2012 WL 707038 at 8 (N.C. Super. 2012).

[120] *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002).

[121] *McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 426 (3d Cir. 2007).

[122] D.I. 24 at ¶13(a), 13(b), 13(c), ¶46, ¶93, ¶94.

"it is a risk held by common shareholders that they will not receive anything in the sale, as preferred shareholders will receive returns before common shareholders . . . ."[123]  On October 1, 2015, Cavi learned that RII was sold for 10 million dollars.[124] Cavi was told he own a 5.48% equity in the company on June 30, 2015;[125] however, he received nothing after the acquisition.  Most information was exclusively within control of Defendants.  Plaintiff adequately pled, with particularity, that his action is based on a series of inaccurate, incomplete, or misleading statements made by Defendants, who had exclusive knowledge of the value of the stock because the company was privately held.[126]

## V.      Order and Recommended Disposition

Consistent with the findings contained in this Report and Recommendation,

IT IS RECOMMENDED that defendant's motion to dismiss (D.I. 28) be GRANTED in part and DENIED in part.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  Any objections and responses thereto are limited to ten (10) pages each.  The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

---

[123] D.I. 29 at p. 28.
[124] D.I. 24 at ¶453.
[125] D.I. 24 at ¶444.
[126] D.I. 24 at ¶13(a), 13(b), 13(c), ¶46, ¶93, ¶94.

Dated: February 17, 2017          /s/ Mary Pat Thynge
                                              Chief U.S. Magistrate Judge